IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2019 JUL 23 AM 11:59

S.D. OF N.Y.

```
-----------------------:
                       :
NGONO ANDRE MARIE      :
       Plaintiff.      :
                       :
     v.                :
                       :
UNITED STATES OF AMERICA :
            Defendant. :
-----------------------:
```

# 19 CV 6854

CIVIL ACTION DOCKET NO._____

## COMPLAINT

### INTRODUCTION.

1.  Plaintiff Ngono Andre Marie, I am incarcerated at the D.Ray James Privately owned Federal Prison located in the state of Georgia. I bring this civil action against the UNITED STATES OF AMERICA, for the tortious acts of its employees committed against me the plaintiff at the Metropolitan Correctional Center of New York.

## II.  THE PARTIES.

### A.  PLAINTIFF.

2.  NGONO ANDRE MARIE, I am the plaintiff in this civil action. I was detained at the Metropolitan Correctional Center (MCC) in New York, from March 7, 2016 to August 5, 2017. I was held at the MCC pending the disposition of my criminal case. The incidents underlying this complaint occured at MCC within the time period mentioned above.

### B.  DEFENDANT.

3.  The UNITED STATES OF AMERICA is the proper defendant in this civil action, because The UNITED STATES has agreed to be sued for certain actions of its employees when acting within the scope of their office or employment.

### III.    JURISDICTION AND VENUE.

4.    The District Court has subject matter jurisdiction pursuant to 28 USCS §§ 1346(b), 28 USCS §§ 2671-80, 28 USCS § 1331.

5.    Venue is proper in this Court pursuant to 28 USCS § 1391.

### IV.    NARRRATIVE OF THE INCIDENTS.

6.    On March 7, 2016 following my arrest by the FBI, I was placed in pretrial detention at the MCC in New York pending trial. While in MCC, I was put in a two men cell with inmate Car Peter. The first night that I spent with Car in the Cell, he began to smoke an illegal drug known as K2. That same night, I told Car that I was a non-smoker, and that I did not want to be intoxicated with the toxic fumes of K2. On the second night, Car smoked again ignoring my serious health concerns. In the morning following the second night, and while I was still asleep, Car brought another inmate in the cell and they began to smoke K2. At the intoxicating smell of K2, I woke up and asked Car and his friend to go smoke K2 outside the cell. Carl and his friend refused to vacate the cell. At their refusal, I went to the correctional officer on duty that day and informed him of K2 being smoked in the cell by Car and his friend. I further asked the correctional officer to separate me from Car in order to avoid any escalation of the situation. The officer asked me to follow him to the cell where Carl and his friend were smoking K2.

7.    When we arrived at the cell, Car had already flushed the rolls of K2 in the toilet. Car and his friend stood at the cell's door observing the officer and I as I reported the incident to the officer. the officer and I arrived and entered into the cell. The odor of K2 was still vivid in the cell and I asked the officer to smell for himself and he did smell the odor of K2 in the cell. I further retrieved the equipment used by Car to light up the K2 rolls in the cell, and I showed it to the officer. The equipment consisted of two small radio's batteries,and a razor blade.After the officer smelled and saw the equipment

used by Car and his friend to smoke K2 in the cell, he asked Car and I to follow him to his office.

8.  As I tried to follow the officer holding the equipment on my right hand, Car grabbed me from behind and asked me to give him the equipment. I told Car that the equipment was evidence that he and his friend smoked in the cell, and that such evidence was needed to substanciate my claim that they smoked in the cell. Car then tackled me on the ground, and during my fall,I let go of the evidence, Car's friend took the equipment and disapeared. While I was on the ground, I called upon the correctional officer for help as Car manhandled me. The officer simply looked behind, saw me on the groung but kept on going to his office. He later activated his body alarm and additional officers arrived  at the scene. Car and I were  taken to the Special Housing Unit (SHU) where I was charged and sanctioned by the Disciplinary Hearing Officer (DHO)(see incident report on record).

9.  In the SHU, I was housed with another inmate who also turned out to be a heavy K2 smoker and he received a good supply of K2 in SHU. He smoked days and nights, and for 7 days and 7 nights, I was exposed to the very toxic fumes of K2 that I tried to excape in the first place. After 7 days, the drug addict was released to the general population of inmates. The next inmate who were cell up with me, luckily did not smoke. I spent 47 days locked in SHU, and Car and I were released the same day back to the general population. I was Sent to unit 7 south in MCC.

10.  After the incident, Car and his friend told other inmates that I had informed on them and that I was a 'Government Informant'. The news travel very fast in prison, and soon,the entire prison population at MCC knew that I had transgressed the unwritten inmate own code of conduct and regulation which makes it a serious crime to inform on another inmate,or provide information to prison employees about illegal activities of another inmate. As a result of my committing the inmate own prohibited act, I became inmates's enemy. I was bullied by other inmates, I was called snitch, rat,Government Informant (GI), cooperating witness (CW). I received  death threats from other inmates. they bullied me,

they harassed me, they all wanted to fight me. Every time I went to the unit team and asked for help, every time I received the same answer that if I did not feel safe around other inmates in the unit, I should check myself into the SHU for protection. This meant that I was to be kept in SHU for the entire duration of my pretrial proceedings. Because the risk of being exposed to harmul and toxic fumes of K2 are very high in SHU than in General population units, I decided that I would not check myself into SHU.

11.    Inmates at MCC continued to bully and harass me. My life in MCC became unbearable. I either had to commit suicide to end the bullying and harassments, or I had to stand up for myself irrespective of the consequences that I was to suffer. I decided to stand up for myself and fight for my life. I reoganized my prison's daily schedule in order to avoid contact with other inmates as much as  possible. I decided that I was to watch the news on television early in the morning in the gymnasium when it was usually empty.

12.    In the morning of June 30, 2016, I went to the gymn to watch the news, and inmate Lamar Lawrence was there doing physical excercise. I switched the T.V to CNN, but inmate Lamar asked me to swicth the T.V back to the previous channel. I did as Lamar asked me to do, and I exited the gymn. The following morning, I noticed that the gymn was completely empty, so I went inside to watch the news. I turned the T.V on to CNN and I began to watch the news. Few minutes later, Lamar came inside the gymnasium and turned the T.V off. I told Lamar that I was watching the news. Inmate Lamar replied and said that the T.V in the gymn was ran by him, and that he did not want me in the gymn. because, he said I was a Government Informant and a snitch. Inmate Lamar then asked me to vacate the gymnasium. I told inmate Lamar that I was an inmate just like him, and that I had every right to be in the gymn and watch T.V as much as he did. I then went to turn the T.V back on. As soon as I turned the T.V back on, inmate Lamar attacked me. He punched me  multiple times on the face, then violently pushed me against the wall. I landed on the wall with my back, then I saw inmate Lamar advancing toward me with closed hand fists to hit me again. Because I had no way to escape, I decided to fight as self defense. As I fought back in the gymn, the correctional officer on duty activated his body arlarm and additional correctional officers

arrived at the gymn. Lamar and I were both taken to the SHU where I was charged and sanctioned by DHO (see incident and DHO reports on record).


13    The MCC Prison's SHU policy dictates that inmates while in SHU are only allowed three showers per week. one day, I was scheduled to take one of my weekly shower. When the shower officer came to take me to the shower room, I was on the toilet stool and so the officer waited for me to finish with the toilet. once I was done with the toilet, I washed my hands and signaled to the officer that I was ready for the shower. The officer opened the small slot on the cell's door and I inserted my hands to be handcuffed. The officer asked me to wash my hands, and I told the officer that I had already washed my hands. The officer said that I should wash my hands for the second time because there were germs on my hands, and that he did not want to touch such germs. I told the officer that there were no germs on me as he presented it. I suggested to the officer that he could wear latex gloves if he did not want to touch me with his bare hands, At my suggestion, the officer became angry and stated that I refused to be taken to the shower room. I told the officer that I did not refuse to be taken to the shower room, and that it was him the officer who refused to take me to the shower room.


14.    The shower officer closed the slot and went on to take other inmates to the shower room. Once he was done with the other inmates, the shower officer and the officer in charge (OIC) Scott came to my cell's door. Scott asked me if I refused to be taken to the shower room. I told Scott that I did not refuse to be taken to the shower room. Scott then asked me if I wanted to take a shower, amd I told Scott that I indeed wanted to take a shower. Scott then opened the small slot on the door and I inserted my hands to be handcuffed. Once I was in handcuffs, OIC Scott opened the door and took me out of the cell. It is only then that Scott informed me that the shower officer had complained to him that I was disrespectful to him (the shower officer), and Scott stated that he was about to teach me a lesson, because no inmate can disrespect his officer when he is the OIC. Scott then walked me onto the common area of the SHU and headed toward the SHU's exit door. I asked Scott where he was taking me, and he only asked me to keep walking. I stopped walking and I again

asked Scott where he was taking me. At that point Scott lifted me up and off the ground and took me to a room in the SHU known as Guantanamo Box, or simply G-box.

15.   The G-box was so named because it is a room where no camera was instaled that could capture the act of torture that happen in that room. G-box at MCC is where rogue officers torture inmates with no worry about video recording of the tortures. Once Scott took me inside G-box, he slamed me on the concrete floor and injured me (see medical record in MCC custody). When Scott slamed me on the concrete floor, he asked the shower officer to hold me down on the ground while he retrieved a belt. Scott hit me with the belt multiple times, and I sustained bumps, bruises and swollens on my back, feet and arms. when Scott stopped hitting me, he called additional officers and ordered them to hold me down. Scott then called the Lieutenant and a Camera lady to record  the part that Scott wanted to be recorded. During the ordeal, I suffered excruciating pain and extreme emotional distress.

16.   The Lieutenant took me back to the SHU's cell and Scott did not allow me to take a shower thereafter. He further instructed other officers not to take me to the shower room during my stay in the SHU. I complained to the warden about the situation and he simply ignored me. I was kept in SHU for 90 days, and while I was still in SHU, Scott continued to harass me and discriminate against me. Scott stated that he treated me the way he did because I was not american. scott bragged to other inmates that he whupped my ass with a belt and told other inmates that they would follow suit if they act crazy on his watch. Scott also refered to me as "motherfuker" when talking about me. Scott further instructed other officer never to give me basics hygiene items such toothpaste, toothbrush, soap and shaving razor, so I did not receive basic hygiene items during my stay in SHU.

17.   Sometime while in SHU, I heard officers telling other inmates to get their cell ready for inspection, because the inspectors were coming to the SHU. So I wrote on the wall facing the door so that the inspectors can read about my situation. I wrote on the wall and it read: Officers please do the job you are paid to do and do me no favors, because I hate favors. The inspectors came to the SHU and saw my wall writting. the warden was also there

that day and he also saw my writting,and he even asked Scott if I were the one who wrote on the wall because he did not believe that I can write in english. I wrote the statement on the wall to inform the inspectors that I was not being provided with the basics in SHU as mandated by the law. I also wrote the statement because one officcer told me that any thing they gave me in SHU was simply a favor that they were doing to me. I disagreed.

18.  After the warden and the inspectors read my statement on the wall and left the SHU, Scott became angry. Scott came to my cell's door and opened the small slot on the door, then asked me to insert my hands to be handcuffed, so that he can take me to G-box again and whip my 'ass' as he himself stated. I refused to be handcuffed. Scott then stated that I derserved to be whipped in G-box because I accused him and his officers to their superiors that they were not doing their job.

19.  Scott told me that he would not give me food until I accept to take a trip to the G-box. I refused to go to the G-box and so Scott did not give me food that day. The next day, when the food officer refused to give me food, I wrote on a piece of paper and it read : If you cannot feed me, then you cannot see me. I then placed the note on the see through glass on the door. When Scott saw the note on the see through, he opened the slot and asked me to insert my hands so that he can handcuff me and take me to G-box. I refused to be taken to the G-box. At that time, Scott told me that he was going to take me to G-box by all means, and that he was going to call the Lieutenant on duty to open the door, since MCC policy dictates that only a Lieutenant can open a cell door in SHU when inmate is not in handcuffs. Scott said that he would take me to G-box by force once the lieutenant opened the cell's door. After that, Scott closed the small slot on the door and left. Few minutes later, Scott sent Lieutenant Gonzales as he had told me he would. Lt Gonzales came to my cell's door, and opened the small slot on the door. He asked me to insert my hands to be handcuffed. I told Lt Gonzales that I would not insert my hands because Scott wanted to take me to G-box and hit me with a belt. I also informed Lt Gonzales that I had not been fed for two days. Lt Gonzales replied and said to me that, I was not fed because I accused the officers to the warden and the inspectors.

20. Once Lt Gonzales took the side of Scott, I requested to Gonzales that I wanted to speak to the Captain so that he may address my concerns. Lt Gonzales said to me that it was him Lieutenant Gonzales who was in charge of the Special Housing Unit, and not the Captain. Lt Gonzales said that he would not call the Captain, and then he said that he was giving me direct order to cuff up. I told Lt Gonzales that I would not voluntarily agree to be handcuffed just to be taken to G-box. Lt Gonzales said to me that he would remove me from the cell by force and turn me over to Scott whether I agree or not. I told Lt Gonzales that I would not agree to go to G-box. At that time Lt Gonzales then asked me if I was hundred percent sure that I would not agree to cuff up. Lt Gonzales said to me that it was up to me whether I wanted him to do it the easy way or the hard way. I told Gonzales that I was hungry and that I needed food, and not a trip to the G-box. Lt Gonzales then closed the small slot on the door and left. Once Lt Gonzales left, I began to clean my cell because MCC prison is infested with mice and roaches to the point that a single day without cleaning attracts a herd of roaches and mice. I splashed water on the floor and I began to mop the floor.

21. While I was mopping the floor, a lady came to the cell's door and stated that she was the prison's psychologist, and that she wanted to speak to me. So I stopped mopping the floor and removed the piece of paper on the see through on the door, in order to speak to the psychologist. The psychologist then asked me why I had refused a direct order from Lt Gonzales and OIC Scott. I explained to the psychologist that Lt Gonzales and OIC Scott wanted to take me to G-box, and that Scott in particular wanted to hit me with the belt. I also told the psychologist that I had not been fed for two days and that I was very hungry. I then asked the psychologist if there was a way she could get me food to eat. She told me that only food officers could make that call, and that she was not involved in the feeding operations. Next I asked the psychologist if she could call the Captain for me, but she ignored my request and stated that I should just follow the direct orders given to me by Lt Gonzales and OIC Scott. She further told me that she was only there to difuse the situation and avoid any confrontaion. I explained to the psychologist that I was not confrontational and that I was only asking for food and basic hygiene items, and that there was nothing confrontational about me asking for those basic things. The psychologist said to me that I

should just follow and obey direct orders, and submit myself to the handcuffs

22. At that time, I felt like the psychologist sounded more like a prison guard. I then asked her about the type of psychology she was practicing, because I could not believe that a normal psychologist would tell a person to voluntarily submit to a beating, or corporal punishments. She told me she was practicing some type of psychology that I do not recall. I then told her that skinner's type of psychology was better, because skinner fed his subjects very well before giving them a task. When she heard the name Skinner, she asked me if I wanted to hurt myself. I was not sure what connection was there between Skinner and me wanting to hurt myself. Nevertheless, I told her that I did not want to hurt myself. Next, she asked me if I wanted to hurt someone esle, and I again told her that I did not want to hurt someone else. The psychologist then asked me why I was being difficult. I told her that I was not being difficult to her. I also told her that I did not trust Scott, because he once took me out of the cell by acting as if there was no problems, and once I voluntary submitted to the handcuffs, Scott carried me by force to the G-box where he beat me with a belt and inflicted serious injuries. I further told the psychologist that I felt safe inside the cell, because there were cameras inside the cell and on the hallway that could capture Scott actions in case he decided to hit me with a belt in the cell. I then politely excused myself and I told the lady psychologist that I was in the process of cleaning my cell when she came, and that I had already splashed water on the floor and I was ready to mop the floor because it was completely wet. The psychologist left after I excused myself to mop the floor.

23. I was on the ground inside the cell mopping the floor when I heard people speaking outside near my cell's door. I paid no attention and I continued to mop the floor. Few minutes laters, the people outside stopped talking and I then heard the noise from prison guards' keys opening the small slot on the cell's door. I turned to look if it was a tray of food that was being inserted in the slot opening for me to eat. Instead, I saw prison guards through the slot opening dressed in combat uniforms. They wore astronauts like jumpers suits, with comonauts like helmets on their heads, moon walk type of boots on their feet. They wore heavy duty steel workers gloves on their hands, and one held a long steel

bar. I saw one guard inserted his hand through the slot opening. He held on his hand a canister toped with a cone shaped object. The guard then activated the canister and balls of toxic orange gases exploded out of the canister, and straight onto my body. It is only then that I realized that I was being bombarded with dangerous chemical weapon. The guard fired the weapom directly on my face and at a very close range of less than one foot. Under panic, and extreme emotional distress,and fear of dying,and under the painful effects of the corrosive toxic gases, I lost conscious   and I fell flat on the wet floor that I was mopping. The corrosive and toxic gases penetrated my eyes,nose,mouth,ears,skin, and caused me severe burning, redness, swollen, bumps and bruises. The toxic gases also caused my eyes to tear excessively. The toxic gases caused me extreme physiological disruption and mal funtioning of most of my body parts. A big dark spot is now growing in my right eye. The toxic gases caused me accute and chronic blindness in both eyes. My brain functioning has severely diminished due to the intoxication of the corrosive gases and the repeat blows on the head that I suffered during the attack. I was on the floor unconscious when the explosions of the chemical weapon ratled in the cell and I regained consciousness. I got up and grabbed something on the bed and placed it on the slot opening as to prevent more toxic gases from coming into the cell.

24.  I placed the object on the slot's opening and turned around to relieve the burning and the pain with water in the sink. As I tried to get water from the sink, another prison guard forcefully thrusted a long steel bar through the slot opening and hit me with the steel bar on the back of my left leg. The steel bar tore my flesh and opened a big wound on the back of my left leg. At the hard hit on my left foot, I fell again on the floor and lost consciousness. As I was laying unconscious on the floor, another guard shot me multiple times with hard rubber bullets from a shot gun. On the painful impact and the explosion of the shot gun, I regained conscious   and stood up. the shot gun guard continued to shoot at me. the bullets punctured my body in various places and created open wounds. I moved away from the door and I sat on the metalic bed in pain and in fear of dying. When I sat on the metalic bed, I saw blood on the floor and it is only then That I remembered that I was heavily bleeding from all the wounds. I pressed my hands on the most bleeding wounds to slow

down the rate at which I was loosing blood.

25.   As I sat on the metalic bed and pressed my hands on my leg's wounds, Lt Gonzales opened the door and ordered the guards to enter the cell and attack me. the guards who entered the cell first held a big transparant sword shield for batle fields. Three other guards followed behind him, and last was Lt Gonzales. Once inside the cell, the guard holding the sword shield hit me on the neck with the shield and I fell on the floor. He hit me again on the lower back with the shield and I screamed. In an attempt to avoid being repeatedly hit with the big sword shield, I dragged myself under the metalic desk in the cell. When I hid under the desk, Correctional officer called Saint John grabbed me by both of my feet and tried to drag me out from under the desk. I held tied onto the desk's foot and prevented Saint John from dragging me out of the desk. Saint John became frustrated at his failure to drag me out of the desk. At that time, Saint John inserted his hand inside my underwear boxer and grabbed me by both of testicles and the penis. He squeezed my genital so hard that he injured both of my testicles and more so my right testicle. I should note here that when guards entered the cell, I was only wearing my underwear boxer because it was a hot summer day of August 2016, and the air conditioner was out of service.

26.   Under the extreme pressure and pain of my testicles being cracked, I let go of the desk foot and Saint John dragged me out from under the desk. Another guard placed his foot on my back and began to press my back down and further injured me on my back. Saint John shackled my feet, while the other guards handcuffed my hands on my back. Because I was severely injured and I could not walk on my own, Lieutenant Gonzales then ordered the guards to carry me up stairs within the Special Housing Unit (SHU). When the guards carried me up they intentionally pulled on the chains and shackles and caused friction of the iron with my skin. Since the shackles and handcuffs were indented, the dents dug into my hands and feet and seriously injured me on those body parts.

27.   When we arrived  up stairs, the guards droped me on the concrete floor in the hallway,in front of the showerroom.Lt Gonzales then ordered the guards to seal the drainage

holes on the shower floor so that no water can drained out of the shower room's floor. Next Gonzales ordered the guards to turn the shower water onto maximum cold and let it run for a while, as I was laying on the hallway in front of the shower room. Gonzales orders were promptly executed by the guards. the guards sealed the shower drainage on the shower floor with latex gloves , and then opened the water to maximun cold as ordered by Gonzales. Once enough water ran onto the shower floor and created a small pond big enough, Gonzales ordered the guards to water board me in the pond in the shwower room. The guards  water boarded me by deeping my head inside the pond, and by holding my head down in the water until air bubled out of the pond as I struggled for breathing. Then they lifted my head out of the water and immediately deeped my head in the pond. They repeated the same act multiple times until I passed out, and I became unconscious and unresponsive. C.P.R was performed on me and when I regained consciousness, I saw one guard bent over me with his hands on my chest performing C.P.R, and I started to breath again. Once I widely opened my eyes, the guard told Gonzales that I was breathing. Gonzales then ordered the guards to take me further up stairs in a secluded small medical room near the SHU ADMAX.

28.  Inside the small secluded medical room, Gonzales ordered the guards to to tie me up with chains on a medical table, in addition to the shackles and handcuffs that were on me already. Physician Assistant Chito Evengelista was there when I was being tied with chains in the medical room. As one officer tied me up, officer Saint John hit me with closed hand fist on my testicles and aggravated the testicular injuries that he previously inflicted me when he squeezed and cracked my genital during the assault in the cell. At the  hard hit on my testicles, I cried and screamed out loud, and I told Lt Gonzales that he would be responsible for letting Saint John molest me in front of him. I further told Gonzales that there was a camera in the secluded medical room that had captured Saint John sexual molestation, and the torture they inflicted me inside the secluded small medical room. Lt Gonzales replied and said to me that I would never get the video recordings of the incidents because I am alien with no right in America. Gonzales further said to me that ICE was going to deport me back to Africa before I can even ask for the camera recordings. He said that even if the recordings were available he would never give me such video

recordings. Gonzales also made xenophobics comment about my national origin by stating that I was from Africa where people run naked among other wild animals.

29.    After physician assistant Chito Evengelista concluded his made believe wounds evaluation, he told Gonzales that he was done with me. Chito Evengelista refused to examine my back, neck and testicular injuries despite me telling Chito that I was injured in those body parts and that I felt severe pain in those parts. Furthermore, Chito Evengelista refused to give me pain killer to alleviate my pain and suffering despite the fact that I requested pain killer medicine to Chito Evengelista. I was in extreme pain due to the combined effects of all the wounds and all the traumas I suffered during the horrific tortures. PA Evengalista specifically told me that he would not discuss a treatment plan for my back, neck and testicles injuries. Chito further stated that, he would not start a treatment for my back, neck and testicles's injuries because he only had two weeks left before he retires from his job at MCC. Chito Evengelista was deliberately indifferent to my serious medical needs.

30.    After Chito Evengelista was done, Gonzales ordered his guards to carry me back to the confinment cell. I was carried back to the cell with no pain killer provided to me, and I was in extreme pain. In the way back to the cell, the guards carrying me from the front intentionally droped me on the concrete floor. Because my hands were tied behind with handcuffs, I had no way to break the fall and so I landed on my head and I sustained severe facial injuries. I sustained two big open wounds on my face, and I suffered brain concussion, swollen on the outside and the inside of my head. I also sustained multiple bruises, abraisions, lesions and scratches on my torso, neck,legs,arms, and toes (see medical record of the incidents, on file in my BOP's medical record). After the intentional drop, the guards lifted me up again and carried me to the cell where I was left in extreme pain and extreme emotional distress. I called upon Gonzales to at least help me get pain killer medicines, but he ignored my call for help and paid no attention to my suffering.

31.   Minutes after I was locked in the solitary confinment cell, the nurse came to the cell's door to give me bandages for the multiple open wounds. Once she saw the severity of the wounds on me, she immediately returned to Chito Evengilista the Physician Assistant and pleaded with him to prescribe me appropriate treatment for the serious wounds that she saw on me. She requested that stitches be applied to most of my wounds, but Chito Evengilista conspired with Gonzales not to applied stitches on my wounds for the sole intent to minimized the severity of the wounds inflicted to me by Gonzales and the guards. Face with the refusal of Chito to order stitches on my wounds, the nurse did what she could and applied medical glue on the most severe wounds, and the less severe were ignored. After the nurse intervention, I did not see her thereafter and my wounds were not care for thereafter.I stayed in the solitary confinment for more than two months and Chito failed to do a medical follow up for all the injuries that I suffered during the assault and battery.I received no wounds's care,no prescription for the injuries.Being left without medical care in a solitary confinment cell,my wounds began to form pus inside and smelled very bad to the point that the bad wounds'smell attracted a herd of roaches and mice that further made me sick.

32.   For more than two months I was bed ridden and unable to stand on my own without the support of the metalic bed or sink inside the solitary confinment cell. I was in the SHU for 89 days well beyond the 30 days sentence pronounced by the admistrative judge. Every day I complained about the wounds,pain, back pain,neck pain and testicles's pain and nothing was done to provide me medical treatment. Scott completely refused to transmit my complaint to the appropriate department as I was locked in I could not do anything on my own.

33.   After the attack, Assistant Warden Jane doe gave firm instructions to Scott and other employees not to give me a pen, pencil or paper to prevent me from initiating administrative remedy. Scott placed a note on my cell's door that instructed other employees never to give me a pen, pencil or paper, as per Assistant Warden's order. Furthermore, a group of guard came to my confinment cell to intimidate me, and they placed

a yellow rubber band along the small opening under the cell's door, in order to prevent other inmates from throwing a pen,pencil or paper into my confinement cell. Assistant Warden Jane Doe effectively prevented me from timely filing an administrative remedy with the appeal board of the BOP. She also prevented me from communicating with the outside world as I intended to contact the district court judge of my criminal case and inform him of the wounds inflicted to me by prison's guards. Once my own immune system healed my external wounds, and Gonzales verified that the video recordings preinstaled throughout the facility were intentionally purged, it is only then that I was released from the solitary confinement.

34.    Once in the general population unit, I realized that Assistant Warden also instructed the unit team not to give me the administrative remedy forms. For many times I tried to get the forms from my case manager or counselor, but they all refused to give me such forms under the pretext that the forms were finished and that they were waiting for more forms to be delivered. After months of trying to get the forms myself and failed, I paid another inmate to get me the forms under his name for me,and this is how I was able to exhaust my administrative remedy. In addition, I submitted a tort claim to the appropriate office and it was denied.

## V.  THE INJURIES.

### C.  PHYSICAL INJURIES.

35.    Paragraph 1 through 34 above are incorporated as if fully set forth herein.

36. From the attack orchestrated by OIC Scott and carried out by Lt Gonzales and four guards, I sustained multiple internal and external physical injuries. The injuries listed bellow are not exhaustive  and doctors may dianosed me with additional injuries not known to me at this time.

37.    On my head, I sustained serious chemichal burns on my scalp, face, right and left eyes, nose, both right and left ears, both lips. I also sustained swollen, bruises,

scratches and abraisions on my head. In addition, I sustained facial's redness and hematomas. I sustained one open wound on my scalp, I suffered loosening of front teeth, brain concussion and swollen. As a direct result of my head injuries and the chemical burns, I suffered permement face disconfiguration with two big ugly scars on my face that remind me of the horror every time I look in a mirror. I suffered permement skin, blood vessels, nerves and lymphatic vessels damages. I also suffered permement damage of both eyes with blurred vision and progressisive blindness on both eyes, excessive dryness of both eyes, excessive tearing during the chemical attack.Furthermore, I developed painful pressure on both eyes, with permement deposit of toxic gases on both of my eyes which further contribute to my vision problems. Moreover, I sustained scar tissues in both eyes, ears, nose and mouth. from the assault, torture and battery, I developed accute and chronic skeletal muscles, bones and joints  pains that are unresponsive to the current over the counter medications from prison. Once I am released, I will undergo plastic, elective and reparatory surgeries for the above personal injuries.

38.   On my neck, I sustained serious injuries when I was hit with the sword shield in the cell, and when I was intentionally dropped on the ground by the guards, and as well as during the entire assault, battery and torture by the guards. As a direct result, I sustained severe and serious neck injuries that include but not limitted to dislocation and derangment of my cervical discs, herniation of neck vertebras, neck bruises, lesions, abraisions, and scratches.I now suffer permement neck restricted movements. I have air pressure build up on my neck as a result of the assault at MCC. All of these neck's injuries are causing me severe pain and suffering  and require neck surgery once I am released from prison.

39.   On my shoulder, I sustained one big open wound on my left shoulder, strains and sprains on both shoulders, scars and unpleasent marks on my shoulders, in addition to swollens, bruises, scratches,and abraisions on both shoulders. As a direct result of these shoulders injuries, I struggle with severe shoulder's pain and suffering, and I will undergo shoulder surgeries once I am released from prison.

40.   On my arms, I sustained strains and sprains on both arms, chemical burns, bruises, swollens, scratches, abraisions, lesions on both arms. In addition, I suffered dislocation of bones on both wrists, various open wounds due the tied handcuffs's and frictions on both arms, I sustained open wounds on major and index fingers left arm. futhermore, I suffered permement damage to my left fingers with severe restriction of movement on those fingers. These arm, wrists and hands injuries are causing me severe pain and sufferings,and will require arms hands surgeries once I am released from prison.

41.   On my back, I sustained serious back injuries that include but not limitted to dislocations, derangments and herniations of vertebral discs. In addition, I now suffer severe pressure build up, strains and sprains, abraision of the spine. I also suffer chemical burns on the skin of my back. Furthermore, I suffered bruises, abraisions, lesions, scratches, swollens, and skin irritation. The assault, torture and battery have traumatized my back muscles causing me permement back mucles damages. These back injuries are causing me permement and debilitating back pain and back suffering. I will undergo back surgeries once I am released from prison.

42.   On my genital, I sustained painful external chemical burns, In addition, I sustained severe testicular injuries on both testicles. These testicles's injuries are causing me severe pain and suffering which require removal of both testicles once I am released from prison.

43.   On my feet, I sustained a big open wound on the back of my left leg, and I sustained multiple wounds on both of my feet. I sustained serious injuries on both of my ankles, with dislocation, and derangment of my ankles's joints. In addition, I suffered chemical burns, strains and sprains on both feet. I further sustained injuries on my toes, knees, hips for both feet. Furthermore, I suffered hematomas in both feet.These feet injuries require different surgeries for ankles, knees,and hips.I will undergo orthopedic, elective, reparative, and plastic surgeries on both of my feet once I am released from prison.

### D.  PHYSIOLOGICAL INJURIES.

44. Paragraph 35 through 43 above are incorporated as if fully set forth herein.

45. During and after the assault, battery and torture by Federal employees at MCC, I developed a myriad of physiological issues in my body that were not there before the assault, battery and torture. Among other issues, I developed allergy to certain fruits and vegetables that include allergy to water melon, orange, tangerine, pine aple, romane letuce, cabage, and spinach. These severe allergy are a direct result of being exposed to toxic chemical gases when I was bombarded, intoxicated and exposed to dangerous, and harmful toxic chemicals. In addition  I suffered serious chemical burns leading to imbalanced of my skin's pH that causes me permenent hot flashes as if in menaupose. I also developed permenent tinglings on my fingers and toes causing me extreme feeling of burning sensations. I feel permenent pain and burning sensation on my fingers, toes, underarms and under my feet. I have developed accute and chronic nerves pain as a direct result of the torture. I now batle permenently nerves pain that include sciatica, brachial, dorsal, and pedals nerves's severe pains. In addition, I struggle with accute and chronic headache, blood pressure, constant nauseas, and vomits. I struggle with the inability to focus on simple tasks like never before the torture. I batle scary and frightening nightmares every night due to the attack. In the many nightmares, I see prison guards breaking into my cell and torture me to death. I have also developed a sudden drop and fall, and severe panic attacks, and anxieties as well as other phobias.

### E.  PSYCHOLOGICAL INJURIES.

46. Paragraph 44 through 45 above are incorporated as if fully set forth herein.

47. From the assault, battery and torture, I developed extreme and debilitating mental, emotional, and psychological injuries. The injuries listed below are not exhaustive and psychologists may diagnosed me with many more injuries caused by the assault, battery and

torture by Federal employees at MCC. From the assault,battery and torture, I suffered extreme mental shocks, and exteme frights, permenent feeling of helplessness and hopelessness. I developed severe fear of prison guards, severe fear of prison medical personnel, severe mental and psychological traumas, severe fear of prison psychologists. In addition, I sustained mental injuries and illness causing me severe diminishing of mental capacities. From the assault, battery and torture, I experienced severe fear of dying, chronic sadness, severe depression, severe anxiety, severe phobias. I also suffered severe and extreme mental and psychological extreme emotional distress. In addition, I have, I am, and I will continue to suffer from all of the above mentioned psychological injuries. Thus I suffer and will suffer pain and suffering in the past and future due to the assault, battery, and torture by Federal employees at MCC. These Psychological, mental and emotional injuries are and will require long term treatments by certified psychiatrists and psychologists to help me cope with the myriad of the mental injuries inflicted to me by prison guards at MCC.

## VI.  CLAIMS FOR RELIEF.

48.  Paragraphs 46 through 47 above are incorporated as if fully set forth herein.

49.  Claims for relief below are grouped in categories of claims with similar or close related issues or counts.

## F.  GROUP 1 CLAIMS.

- COUNT 1: Assault,Battery and torture.
- COUNT 2: Excessive use of force.
- COUNT 3: Intentional, Malicious, and wanton infliction of injuries.

50.  Federal and New York state laws prohibit assault, battery and torture of another person. Federal and state laws also prohibit the use of excessive force by law enforcement personnels against the people that they are mandated to protect by law. Furthermore,Federal

and state laws prohibit the intentional, malicious, and wanton infliction of pain for the very purpose of causing harm to another person. On August 18, 2016, Lt Gonzales and four prison guards at MCC assaulted, battered and tortured me in the Special Housing Unit (SHU) in MCC. They used excessive force against me, they intentionally, maliciously, and wantonly inflicted me severe and serious physical, mental, emotional, and psychological injuries.

51.   I was in a solitary confinment cell when Lt Gonzales and four prison guards break into the my solitary confinment's cell and committed the wrongful acts listed under Group 1 Claims consisting of count 1 through 3. Lt Gonzales and the four prison guards were acting in their official capacities when they assaulted, battered, tortured, and intentionally inflicted me severe physical, mental and psychological injuries.

52.   Lt Gonzales and four prison guards violated the laws that prohibit assault, battery, torture, excessive use of force, and intentional, malicious and wanton infliction of injuries to another person. By violating the law, Lt Gonzales and the four prison guards have, under color of Federal and New York state Statutes, Regulations, Ordinances, Customs,or Usage, deprived me the plaintiff of rights secured and guaranteed me by law, thus entitling me the plaintiff to remedy.

## G.   GROUP 2 CLAIMS.
   - COUNT 4: Sexual assault.
   - COUNT 5: Abusive sexual contact.
   - COUNT 6: Aggravated Sexual assault.
   - COUNT 7: Cover up and filing of false and fictitious report about a sexual assault.

53.   Federal and New York state laws prohibit sexual assault, abusive sexual contact, aggravated sexual assault, and the cover up and filing of false and fictitious  report about a sexual assault. On Agaust 18, 2016, I became a victim of sexual assault, abusive sexual contacts, aggravated sexual assault. I further suffered injustice when Lt Gonzales covered up for the sexual assault and file false and fictitious report about the sexual

attack that I was a victim of, at MCC. The sexual attack was committed by Saint John, and Lt Gonzales failed to stop Saint John from sexually molesting me in front of him. Saint John sexually molested me. He initiated abusive sexual contacts with my genital, and he committed aggravated sexual assault when he squeezed and wounded my testicles. Lt Gonzales aided and abeited Saint John to commit the sexual assaults listed above. Gonzales further mislead and misrepresented material fact to the investigators with the sole intent to obstruct justice. Saint John, and Lt Gonzales were acting in their official capacities when Saint John sexually assaulted me and Gonzales failed to stop him.

54.    Saint John and Lt Gonzales violated the law that prohibit sexual violence. By violating the laws that prohibit sexual violence, Lt Gonzales and Saint John have, under color of Federal and New York state Statutes, Regulations, Ordinances, Customs, or Usage, deprived me the plaintiff of rights secured and guaranteed me by law thus, entitling me the plaintiff to remedy.

## H.  GROUP 3 CLAIMS.

   - COUNT 8: Deliberate indifference to my serious medical needs.
   - COUNT 9: Medical negligence.

55.    Federal and New York state laws prohibit the deliberate indifference to serious medical needs by medical personnel, these laws also prohibit medical negligence. On August 18, 2016, I was seriouly and severely injured by federal employees at MCC. After they injured me, I was taken to a medical room where Physician Assistant Chito Evengelista was deliberately indifferent to my serious medical needs, when he refused to examine and treat my back, neck, and testicular injuries.In addition, Chito Evengelista refused to give me pain killer medication despite the apparent fact that I was in extreme pain and suffering. I personally asked for pain killer medicines, but PA Chito declined to give me such medicines. Furhermore, PA Chito refused to write a report about the sexual assault despite the fact that Saint John hit me on the testicles right in front of PA Chito Evangelista. In

addition, I informed PA Chito that I was being sexually molested by Co.Saint John. Furthermore, PA Chito was negligent when he failed to follow up the assessed injuries after the attack. The failure to follow up with the injuries caused my wounds to rut and smell very bad, and attracked roaches and mice that further made me sick in the cell. Moreover, PA Chito was deliberately indifferent to my serious medical needs.

56.   PA Chito Evengenlista was acting in his official capacity when he committed the wrongful acts listed under Group 3 claims above.PA Chito violated the law by committing these wrongful acts.By violating the law,Chito Evengelista has,under color of Federal and New York state Statutes,Regulations,Ordinances, Customs,or Usage,deprived me the plaintiff of right secured and guaranteed me by law thus,entitling me the plaintiff to remedy.

## I.  GROUP 4 CLAIMS.
  - COUNT 10: Breach of duty owed to plaintiff.
  - COUNT 11: Breach of trust and failure to protect.

57.  Federal and New York laws impose a duty to prison employees to care for the inmates under their custody. Federal and state laws also require prison employees to maintain the trust put in them and provide correction that will help inmates re-enter society fully corrected,in addition to protecting inmates while incarcerated. Thus, the trust put in prison employee invest them of the authority to act as role models for those under their custody. During my detention at the MCC, prison employees breached the duty to care and protect me. MCC's taff also failed to live up to the trust put in them as public servants. Warden E.Tatum, Assistant Warden Jane Doe, Lt. Gonzales, OIC scott, and four prison guards were acting in their official capacities when they committed the wrongful acts mentioned under Group 4 claims. The above employees violated the law by breaching the duty owed to me the plaintiff, and by failing to protect me. By violating the law, Warden E.Tatum and his employees mentioned above have, under color of Federal and New York Statutes, Regulations, Ordinaces,Customs, or Usage, deprived me the plaintiff of rights secured and guaranteed me by law thus, entitling me the plaintiff to remedy.

## J.  GROUP 5 CLAIMS.

- COUNT 12: Use of dangerous and deadly weapons to cause harm.

- COUNT 13: Use of ice cold water to torture.

- COUNT 14: Attempt murder.


58.  Federal and New York laws prohibit the use of deadly weapon to cause harm to another person. In addition, Federal and state laws prohibit torture and attempt murder. On August 18, 2016, Lt Gonzales and four prison guards used a fire arm, a steel bar, and a chemical weapon to cause me severe and serious harm. These employees tortured me, and attempted to murder me. Lt Gonzales and four prison guards were acting in their official capacities when they committed the wrongful acts listed under Group 5 claims.


59.  Lt Gonzales and four prison guards  violated the laws prohibiting the wrongful acts listed under Group 5 claims above. By violating the law, Lt Gonzales and the four prison guards have, under color of Federal and New York Statutes, Regulations, Ordinances, Customs, or Usage, deprived me the plaintiff of rights secured and guaranteed me by law thus, entitling me the plaintiff to remedy.


## K.  GROUP 6 CLAIMS.

- COUNT 15: Abuse of process.

- COUNT 16: Abuse of authority.


60.  Federal and New York laws prohibit the abuse of process, and abusive use of authority. From March 7, 2016 to August 5, 2017 Warden E.Tatum, Assistant Warden Jane Doe, Lt Gonzales, OIC Scott, unit team in 7 South, and 5 North, the four prison guards, Psychologist Jane Doe, Physician Assistant Chito Evengelista abused the process and authority to cause me harm, and inflict me serious injuries. the employees mentioned above were acting in their official capacities when they abused the process and authority.


61.  These Federal employees violated the law by committing the wrongful acts listed under

Group 6 claims above. By violating the law, these employees have, under color of Federal and New York Statutes, Reguations, Ordinances, Customs, or Usage, deprived me the plaintiff of rights secured and guaranteed me by law thus, entitling me the plaintiff to remedy.

**L.  GROUP 7 CLAIMS.**

    - COUNT 17: Retaliation

    - COUNT 18: Discrimination

62.   Federal and New York laws prohibit retaliation and discrimination against another person. From the time OIC Scott decided take me to G-box, to the time I was assaulted by Lt Gonzales and his guards, I suffered retaliation and discrmination. I was discrminated against solely based on my national origin when, Scott and Gonzales injured me simply because I am from Africa where "people run naked among other wild animals (quoting Gonzales). Scott and Gonzales retaliated against me because I informed the inspectors that I was not given basics hygiene items. Scott and Gonzales were acting in their official capacities when they committed the wrongful acts  listed under Group 7 claims above.

63  Gonzales and Scott violated the laws that prohibit retaliation and discrimination. By violating the law, Scott and Gonzales have, under color of Federal and New York Statutes, Regulations, Ordinances, Customs, or Usage, deprived me the plaintiff of rights secured and guaranteed me by law thus, entitling me the plintiff to remedy.

**M.  GROUP 8 CLAIMS.**

    - COUNT 19: Conspiracy to interfere with civil rights

    - COUNT 20: Deprivation of rights under color of Federal laws.

64.   Federal and New York Law prohibit a conspiracy to interfere with a civil righ of another person. These Laws further prohibit the deprivation of a right under color of any law. During my time in pretrial detention at MCC of New York, Warden E.Tatum, Assistant

Warden Jane Doe, Lt Gonzales, OIC Scott, Unit Team 7 South, and 5 North, PA Chito, and four prison guards conspired to interfere, and did interfere with my civil rights while I was a pretrial detainee at MCC. Furthermore, the above named Federal employees deprived me of rights under color of law.


65.    Warden E.Tatum, Assistant Warden Jane Doe, Lt Gonzales, OIC Scott, Unit team 7 South, and 5 North, Officer Saint John, and other prison guards were acting in their official capacities when they  inflicted me severe and serious injuries. these employees violated the law when they committed the wrongful acts listed under Group 8 claims. By violating the law, the above mentioned employees have, under color of Federal and New York Statutes, Regulations, Ordinances, Customs, or Usage, deprived me the plaintiff of rights secured and guaranteed me by law thus, entitling me the plaintiff to remedy.


## N.  GROUP 9 CLAIMS

   - COUNT 21: Intentional destruction and alteration of evidence.
   - COUNT 22: Intentional filing of false and fictitious report.
   - COUNT 23: Interference with the administration of justice.


66.    Federal and New York laws prohibit the intentional destruction and alteration of evidence, intentional filing of false report, and interference with the adminisration of justice. After the incidents where Federal employees intentionally inflicted me severe injuries at the Metropolitan Correctional Center (MCC), Warden E.Tatum, Assistant Warden Jane Doe, and Lieutenant Gonzales intentionally altered and destroyed the evidence of the crime. In addition, these Federal employees employees further filed false and fictitious report of the incident and the sexual assault that I have been a victim. Warden E.Tatum and his employees at MCC were acting in their official capacities when they violated the law.These employees committed the wrongful acts listed under Group 9 claims above and violated the law. By violating the law, Warden E.Tatum and his employees have, under color of Federal and  New York Statutes, Regulations, Ordinances, Customs, or Usage, deprived me the plaintiff of rights secured and guaranteed me by law thus, entitling me to remedy.

## O.  GROUP 10 CLAIMS.

- COUNT 24: Cruel and inhumane treatment of a person under custody
- COUNT 25: Slander

67.  Federal and New York laws prohibit cruel and inhumane treatment of a person under the custody of another person. Federal and New York laws also prohibit any form of slander against another person. On August 18, 2016, Federal employees at MCC treated me inhumanely and also slandered me while acting in their official capacities. Warden E.Tatum, Lt Gonzales, OIC Scott, and prison guards violated the law that prohibit the wrong acts mentioned above. By violating the law, The above named Federal employees have, under color of Federal and New York Statutes, Regulations, Ordinances, Customs, or Usage, deprived me of rights secured and guaranteed me by law thus, entitling me to remedy.

## VII. RELIEF SOUGHT.

### P.  COMPENSATORY MONEY DAMAGES.

68.  Paragraph 1 through 67 above  are incoporated as if fully set forth herein.

69.  Plaintiff Ngono Andre Marie, I respectfully seek relief in compemsatory money damages for personal injuries that were inflicted to me by Federal employees while acting in their official capacities. The wrongful acts, omissions, and negligences of these Federal employees directly caused me serious  and severe physical and mental injuries. In addition, the wrongful acts, omissions, and negligences of these Federal employees caused me extreme physical and mental pain and suffering, and extreme emotional distress and psychological harms. By inflicting these injuries, Federal employees caused me pain and suffering. Therefor, I claim compensatory money damages in the sum certain amount of **$5,000,000.00 (Five million dollards),** for past and future pain and suffering, for the cost of all future medical expenses that include but not limitted to the cost of medications for ten years, the cost of all needed surgeries, the cost of specialists and generalists consultations for

ten years. The cost of all illness that had and will derive directly from the attack, the cost of all accute and chronic medical cares for ten years, and the cost of psychologist and psychiatrist consultations and treatments for ten years. Furthermore, I respectfully request addition monetary awards that the court may deem just and proper, including the cost of this action.

## Q. DECLARATORY DECREE.

70.  This court has authority to grant Declaratory relief pursuant to 28 USCS §§ 2201, and 2202.

71.  Actual controversy exist between the parties as to whether Federal employees at MCC intentional purge, deletion, and destruction of the video recordings of the pre-instaled cameras in the facility violated the equal access to justice. Actual controversy also exist as to whether these Federal employees violated the Prison rape Elimination Act (PREA) policy on sexual violence in prison. MCC claims to adhere to PREA policy. Even if PREA on itself does not create a right that can be actionable in a court of law, it nevertheless requires transparency in sexual allegations, and imposes a duty on prison officials to save the video recordings of sexual violence in prison, so that legal action on sexual assault can be substanciated and coroborated by the evidence. The actual controvercy here is that, Federal employees at MCC arbitrarily concluded that, my allegations of sexual assaults, sexual molestation by Saint John were unsubstanciated without looking at the pre-instaled video recording of the incidents. I have given specific instant and places where the sexual assault and sexual molestation occured. Specifically, I stated that the sexual assault and sexual molestation occured when I was dragged under the metalic desk inside the cell. the second instant occured when Saint John hit me on my testicles in the secluded medical room in front of PA Chito and Lt Gonzales.

72.  These specifics instant were recorded on the pre-instaled cameras and these recording are only about 7 to 10 minutes in duration. Because Federal employees

intentionally destroyed the evidence of the horrendous sexual violence committed by one of their colleague, konwing that I have inititated a legal action regarding the sexual attacks. I request that the court adjudicates on this issue under the declarotory decree provisions above.


73.  WHEREFORE, I respecfully request that the court issues a DECLARATORY DECREE that:
   - The warden and his employees intentionally spoliated crucial evidence
     consisting of pre-instaled cameras video recordings about the sexual assault.
   - Such spolition sole intent was to obstruct justice.
   - The Warden and his employees violated equal . access to evidence.
   - The Warden and his employees obstructed justice.


## R.  INJUNTIVE RELIEF.


74. Paragraph 68 through 73 above are incorporated as if fully set forth herein.


75. By virtue of Federal employees at MCC failure to preserve evidence of the second most violent crime known as sexual assault, and by virtue of violation of law that prohibit obstructtion of justice, interference with a Federal investigation, interference with the proper administration of justice, misleading the public about a sexual assault, spoliation of crucial evidence about the incidents, plaintiff has no other adequate remedy, and so respectfully ask the court to enter an order barring and preventing defendant from introducing into evidence the misleading hand held camera recording made by the attackers with the sole intent to mislead the court,the public, and obstruct justice.


76. In anticipation of the defendant's plan to remove me from the jurisdiction of Federal Court through order of deportation, I further ask this court to issue an order preventing defendant from deporting or removing me from the United States before the disposition of this case by this Court.

## VIII.   PRAYER FOR RELIEF.

77.   Paragraph 74 through 76 above are incorporated as if fully set forth herein.

78.   Ngono Andre Marie, the plaintiff, I pray that this Honorable Court finds for me the victim, and grants me all relief sought in this action. Specifically, I pray that your Honor grants me the sum certain of $5,000,000.00, in addition to the injunctive relief sought above.

## IX.   CONCLUSION.

79.   Paragraph 1 through 78 above are incorporated as if fully set forth herein.

80.   As we have seen in the narrative of the incidents's section that is supported by the evidence that Federal employees inflicted me injuries. The medical records and the incident reports written by the attackers themselve indicate that the injuries were inflicted to me by Federal employees at the MCC prison. Federal employees inflicted me serious and severe personal injuries. As a direct result of the wrongful acts of these employees, the United States becomes the proper defendant. Because I suffered injuries that caused me pain and suffering in the past, and will cause me pain and suffering in the future, I respectfully claim relief in compensatory money damages in the amount of $5,000,000.00 (Five million dollards).

81.   The compensatory money damages when awarded by the court, will first send a strong message to prison employees at MCC who violated the laws. The money damages when awarded, will send a message to these Federal employees that no one is above the law. Second, when awarded, the money damages will deter Federal employees at MCC from wrong doing within the scope of their employment. In addition, the money damages when awarded, will promote respect for the law among the Federal employees named in this complaint. Third, when awarded,the money damages will serve the best interest of justice, because every person

including a pretrial detainee has the right to be free from the fear of being injured, let alone being actually injured by Federal employees. Compensatory money damage is the only remedy available to me the plaintiff. WHEREFORE, I respectfully ask this HONORABLE COURT to award plaintiff $5,000,000.00 (Five million dollards) and any other monetary award the COURT may deem necessary, just and proper.

Respecfully submitted.

NGONO ANDRE MARIE

PRO SE PLAINTIFF

Date: 07-15-2019.

# Bureau of Prisons
# Psychology Services
# Sexual Abuse Intervention

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | NGONO, ANDRE | | | | Reg #: | 77244-054 |
| Date of Birth: | 03/24/1972 | Sex: | M | Facility:  BRO | Unit Team: | G |
| Date: | 09/06/2017 11:45 | Provider: | McCabe, Joseph PhD. | | | |

2019 JUL 23  AM 11:51

## Comments

As per Program Statement 5324.12 and the Institutional Supplement on Sexually Abusive Behavior Prevention and Intervention, all allegations of Sexual Abuse/Assault will be promptly and effectively reported and investigated.

Date/Time of Incident: 08/21/2016 (approximately)

Date/Time Psychology Aware: 09/06/2017 at approximately 0830

Date/Time of Intervention: 09/06/2017 at approximately 930

Inmate NGONO is a 45 year old African American male on Holdover status.

During today's interview, inmate NGONO reported the following:
Approximately one year ago while incarcerated at MCC  Manhattan, inmate NGONO reported that he was the victim of sexual assault by staff. Per his report, he was celled with an inmate who was smoking K2 which resulted in a physical altercation as inmate NGONO did not approve of smoking in his cell. While in SHU, inmate NGONO did not perceive that his "minimum care" needs were being met. He reported engaging in a verbal altercation with one staff member. At this point inmate NGONO reported that he became non-compliant with staff requests "until my needs were met." On approximately 08/21/2016, he was ordered to submit to restraints which he refused. A DCT team was used to extract him from the cell and while inmate NGONO was holding on the frame of the desk, he alleges that an officer reached into his boxers and grabbed his testicles until he released his grip on the frame. Inmate NGONO reported experiencing testicular pain for which he states he was brought to health services. He reported later submitting a BP-8 and stated that his complaint has been forwarded to "Washington D.C. office for investigation."

Inmate NGONO was offered victim advocacy services. He stated that he was not interested in an external or internal victim advocate at this time. He was provided with the phone number for the toll-free national sexual assault hotline. He was offered individual counseling through Psychology Services but declined the need for services at this time. He was informed of ways to seek assistance if need and agreed to do so if matters changed for him.

Inmate NGONO denied having safety concerns during this interview. His mental status was examined and was determined to be nominal at the time of this interview. He denied any suicidal or homicidal ideation at this time. He will continue to be seen in accordance with Psychology Service's policy.

Findings/Recommendation:
1. At the time of this report inmate denies imminent risk of sexual assault or physical harm.
2. Notifications have been made to Operations Lieutenant.
3. Psychology Services follow-up was not requested nor is required at this time. He was advised how to request additional services as needed/desired both during standard and off-duty working hours.
4. For the next 90 days, or longer if deemed necessary, the inmate will be monitored to ensure there is no retaliation.

Completed by McCabe, Joseph PhD on 09/06/2017 11:51

**Reviewed by Segal, Michael PsyD/Chief Psychologist on 09/12/2017 09:08**

**Bureau of Prisons**          **\*\*SENSITIVE BUT UNCLASSIFIED\*\***
**Psychology Services**
**Disruptive Behavior Intervention**

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | NGONO, ANDRE | | | | Reg #: | 77244-054 |
| Date of Birth: | 03/24/1972 | Sex: | M | Facility: NYM | Unit Team: | 7 |
| Date: | 08/18/2016 13:36 | Provider: | Imeri, Darlene PsyD | | | |

**Comments**

This writer was contacted at about 12:10 PM to engage in confrontation avoidance with Mr. Ngono to have him submit to restraints for a cell rotation. When this writer initially saw Mr. Ngono, he uncovered his window on the cell door and asked this writer what type of Psychology does this writer practice. He stated the only type that works in prison is Skinner. He stated behavioral interventions only work. He stated he is not going to come out of his cell and will have to be forced. He stated that he is ready for staff and showed this writer the soapy water on the cell floor. He said he will hurt staff if they hurt him. He stated he was forced to come to prison and they will have to force him to leave his cell.

He did not want to answer psychological history questions. His PSIQ that he completed on 3/07/16 was reviewed and he denied any mental health history, any past suicidal thoughts or attempts, and any substance abuse. His BEMR intake when he first arrived was also reviewed and during that interview he denied any mental health history and any past suicide attempts.

Current Mental Status: When being interviewed by this writer he was pleasant and exhibited a neutral mood with a mildly restricted range of affect. His speech was logical and coherent, with no loosening of associations or tangential, circumstantial or irrelevant speech. Auditory and visual hallucinations were not reported, and delusions were not elicited. He denied current suicidal ideation. He was future oriented. He does not appear to be an immediate danger to self. He denied thoughts of hurting others unless someone hurts him.

During confrontation avoidance at about 12:48 PM, he acknowledged this writer and stated he already had a conversation with this writer. He did not uncover the window on his cell door this time and he refused to submit to restraints for the cell rotation. Confrontation Avoidance was unsuccessful.

During the use of force, Mr. Ngono was combative, was screaming, and was refusing to cooperate.

He was educated about both routine and emergency procedures for contacting Psychology staff. No follow up is needed at this time. However, he was encouraged to self-refer to Psychology if needed. If he remains in SHU, he will be seen by Psychology in SHU Rounds and in SHU Reviews.

Completed by Imeri, Darlene PsyD on 08/18/2016 15:51

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | |
|---|---|---|
| Inmate Name:  NGONO, ANDRE | | Reg #:  77244-054 |
| Date of Birth:   03/24/1972 | Sex:     M    Race:  BLACK | Facility:  NYM |
| Encounter Date:  05/03/2016 09:31 | Provider:  Bussanich, A. MD/CD | Unit:   G06 |

Injury Assessment - Non-work related encounter performed at Health Services.

**SUBJECTIVE:**

**INJURY   1      Provider:**  Bussanich, A. MD/CD

    **Date of Injury:**    05/03/2016 08:30      **Date Reported for Treatment:**    05/03/2016 09:32

    **Work Related:**    No      **Work Assignment:**    UNASSG

    **Pain Location:**

    **Pain Scale:**    0

    **Pain Qualities:**

    **Where Did Injury Happen (Be specific as to location):**

        HOUSING UNIT.

    **Cause of Injury (Inmate's Statement of how injury occurred):**

        "I TOLD HIM NOT TO SMOKE. HE GRABBED ME AND WE STARTED WRESTLING. I DID NOT HIT HIM
        AND HE DID NOT HIT ME. HE MISSED WITH HIS PUNCHES

    **Symptoms (as reported by inmate):**

        NONE EXCEPT FOR ANXIETY.

**OBJECTIVE:**

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 05/03/2016 | 09:34 NYM | 98.1 | 36.7 | Oral | Bussanich, A. MD/CD |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 05/03/2016 | 09:35 | 97 | Via Machine | Regular | Bussanich, A. MD/CD |
| 05/03/2016 | 09:35 | 87 | Via Machine | Regular | Bussanich, A. MD/CD |
| 05/03/2016 | 09:34 | 92 | Via Machine | Regular | Bussanich, A. MD/CD |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 05/03/2016 | 09:35 NYM | 163/116 | Left Arm | Sitting | Adult-large | Bussanich, A. MD/CD |
| 05/03/2016 | 09:35 NYM | 148/113 | Right Arm | Sitting | Adult-large | Bussanich, A. MD/CD |
| 05/03/2016 | 09:34 NYM | 150/105 | Left Arm | Sitting | Adult-large | Bussanich, A. MD/CD |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 05/03/2016 | 09:35 NYM | 98 | Room Air | Bussanich, A. MD/CD |
| 05/03/2016 | 09:35 NYM | 99 | Room Air | Bussanich, A. MD/CD |
| 05/03/2016 | 09:34 NYM | 100 | Room Air | Bussanich, A. MD/CD |

**Height:**

| Date | Time | Inches | Cm | Provider |
|---|---|---|---|---|
| 05/03/2016 | 09:46 NYM | 70.0 | 177.8 | Bussanich, A. MD/CD |

**Weight:**

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|

| Inmate Name: | NGONO, ANDRE | | | | Reg #: | 77244-054 |
|---|---|---|---|---|---|---|
| Date of Birth: | 03/24/1972 | | Sex: M   Race: BLACK | | Facility: | NYM |
| Encounter Date: | 05/03/2016 09:31 | | Provider: Bussanich, A. MD/CD | | Unit: | G06 |

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|
| 05/03/2016 | 09:34 NYM | 182.3 | 82.7 | | Bussanich, A. MD/CD |

**Exam:**

    **General**

        **Appearance**

            Yes: Appears Well

        **Nutrition**

            Yes: BMI reviewed (enter in comments)

    **Eyes**

        **General**

            Yes: PERRLA, Extraocular Movements Intact

        **Fundus Exam**

            Yes: Grossly Normal Retina

    **Pulmonary**

        **Auscultation**

            Yes: Clear to Auscultation

            No: Rhonchi, Wheezing

    **Cardiovascular**

        **Auscultation**

            Yes: Regular Rate and Rhythm (RRR), Normal S1 and S2

            No: S3, S4

    **Neurologic**

        **Cranial Nerves (CN)**

            Yes: Within Normal Limits

**Exam Comments**

    BMI IS 26.2.

    NO SKIN LESIONS OR ECCHYMOSIS

    GRADE 1-2/6 SYSTOLIC MURMUR LEFT STERNAL BORDER.

    UROGENITAL AREA VIA VISUAL INSPECTION REVEALED NO LESIONS.

**ASSESSMENT:**

    Other place in prison as place of injury/occurrence, Y92148 - Current

**PLAN:**

**Disposition:**

    Follow-up at Sick Call as Needed

    Return Immediately if Condition Worsens

    Return To Sick Call If Not Improved

**Other:**

    WE DISCUSSED AT LENGTH HIS ELEVATED BP. HE IS NOT WILLING TO START ANTIHYPERTENISIVES. CCC
    DONE CONTEMPORANEOUSLY. NOTE TO FOLLOW.

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 05/03/2016 | Counseling | Plan of Care | Bussanich, A. | Verbalizes Understanding |

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | NGONO, ANDRE | | | Reg #: | 77244-054 |
| Date of Birth: | 03/24/1972 | | | Facility: | NYM |
| Encounter Date: | 05/03/2016 09:31 | Sex: M | Race: BLACK | Unit: | G06 |
| | | Provider: | Bussanich, A. MD/CD | | |

**Copay Required:** No          **Cosign Required:** No
**Telephone/Verbal Order:** No

Completed by Bussanich, A. MD/CD on 05/03/2016 10:00

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: NGONO, ANDRE | | Reg #: 77244-054 |
| Date of Birth: 03/24/1972 | Sex: M  Race: BLACK | Facility: NYM |
| Encounter Date: 07/01/2016 10:15 | Provider: Beaudouin, Robert MD | Unit: G07 |

Injury Assessment - Non-work related encounter performed at Health Services.

**SUBJECTIVE:**

**INJURY  1        Provider:  Beaudouin, Robert MD**

| | | | |
|---|---|---|---|
| Date of Injury: | 07/01/2016 07:30 | Date Reported for Treatment: | 07/01/2016 10:14 |
| Work Related: | No | Work Assignment:  UNASSG | |

Pain Location:

Pain Scale:   0

Pain Qualities:

Where Did Injury Happen (Be specific as to location):

7 SOUTH , RECREATION CAGE.

Cause of Injury (Inmate's Statement of how injury occurred):

HE, A YOUNG INMATE,  PUNCHED ME ON THE LEFT FOREHEAD. HE HIT ME FIRST. I TOLD HIM NOT TO  CHANGE THE TV CHANNEL I WAS WATCHING. WE HAD A FISTFIGHT OVER THAT.

Symptoms (as reported by inmate):

I DO NOT HAVE A HEADACHE. I AM NOT DIZZY.  MY VISION IS FINE.  I  AM FINE. I DO NOT HAVE ANY INJURIES.

**OBJECTIVE:**

**Pulse:**

| **Date** | **Time** | **Rate Per Minute** | **Location** | **Rhythm** | **Provider** |
|---|---|---|---|---|---|
| 07/01/2016 | 10:18 | 125 | Via Machine | | Beaudouin, Robert MD |

**Respirations:**

| **Date** | **Time** | **Rate Per Minute** | **Provider** |
|---|---|---|---|
| 07/01/2016 | 10:18 NYM | 14 | Beaudouin, Robert MD |

**Blood Pressure:**

| **Date** | **Time** | **Value** | **Location** | **Position** | **Cuff Size** | **Provider** |
|---|---|---|---|---|---|---|
| 07/01/2016 | 10:18 NYM | 137/91 | Left Arm | Standing | | Beaudouin, Robert MD |

**SaO2:**

| **Date** | **Time** | **Value(%)** | **Air** | **Provider** |
|---|---|---|---|---|
| 07/01/2016 | 10:18 NYM | 98 | Room Air | Beaudouin, Robert MD |

**Exam:**

**General**

**Affect**

Yes: Cooperative, Irritable

**Appearance**

Yes: Appears Well, Appears Distressed, Alert and Oriented x 3

No: Dyspneic, Appears in Pain, Writhing in Pain, Pale, Diaphoretic

**Head**

**General**

No: Battle's Sign, Raccoon Eyes

| Inmate Name: | NGONO, ANDRE | | | Reg #: | 77244-054 |
|---|---|---|---|---|---|
| Date of Birth: | 03/24/1972 | Sex: | M   Race: BLACK | Facility: | NYM |
| Encounter Date: | 07/01/2016 10:15 | Provider: | Beaudouin, Robert MD | Unit: | G07 |

**Exam:**

**Temporal Mandibular Joint**
No: Swelling, Inflammation, Tenderness, Non-tender on Palpation, Trauma, Uneven Bite

**Eyes**
**General**
Yes: PERRLA, Extraocular Movements Intact

**Conjunctiva and Sclera**
No: Subconjunctival Hemorrhage

**Ears**
**External Ear**
Yes: Within Normal Limits

**Nose**
**General**
No: Deformity

**Face**
**General**
No: Ecchymosis, Periorbital Edema, Deformity

**Sinus/Maxilla**
Yes: Within Normal Limits

**Mandible**
Yes: Normal Range of Motion
No: Swelling, Deformity

**Lips**
**General**
Yes: Within Normal Limits

**Mouth**
**General**
Yes: Within Normal Limits

**Teeth**
No: Fractured Tooth/Teeth, Avulsion

**Tongue**
Yes: Within Normal Limits

**Musculoskeletal**
**Wrist/Hand/Fingers**
Yes: Normal Bony Landmarks

**Gait**
Yes: Normal Gait

**Neurologic**
**Cranial Nerves (CN)**
Yes: Within Normal Limits

**Motor System-General**
Yes: Normal Exam

**Exam Comments**
HEAD: + MILD EDEMATOUS AND TENDER AREA OF ABOUT 2X 2 CM ON LEFT FOREHEAD, OTHERWISE ATRAUMATIC.
LEFT KNEE -LATERAL ASPECT: + 0.3 X 0.2 CM SUPERFICAL ABRASION.
RIGHT KNEE- MEDIAL ASPECT : + 0.3 X 0.3 CM SUPERFICIAL ABRASION.
SKIN EXAM IS OTHERWISE INTACT.

| Inmate Name: | NGONO, ANDRE | | | | Reg #: | 77244-054 |
|---|---|---|---|---|---|---|
| Date of Birth: | 03/24/1972 | | Sex: | M    Race:  BLACK | Facility: | NYM |
| Encounter Date: | 07/01/2016 10:15 | | Provider: | Beaudouin, Robert MD | Unit: | G07 |

**ASSESSMENT:**

Other disorder of the skin and subcutaneous tissue, L988 - Current

**PLAN:**

**New Radiology Request Orders:**

| Details | Frequency | End Date | Due Date | Priority |
|---|---|---|---|---|
| General Radiology-Skull-General | One Time | | 07/05/2016 | Routine |

Specific reason(s) for request (Complaints and findings):

44 YR OLD MALE WITH MILD SWELLING OVER LEFT FOREHEAD FROM BEING PUNCHED IN A FIGHT WITH ANOTHER INMATE. PLEASE PERFORM SKULL XRAY.

**Disposition:**

Follow-up at Sick Call as Needed

**Other:**

SKIN ABRASION WAS CLEANED WITH WATER AND BETADINE.
PT'S TDaP VACCINATION IS CURRENT.
PT'S PULSE WAS ELEVATED POST ALTERCATION.
PATIENT ADVISED TO INFORM HSU VIA THE UNIT OFFICER OR WHEN THE MLP DOES SHU ROUNDS IF HE DEVELOPS HEADACHE, DIZZINESS, DIPLOPIA, FACIAL PAIN, OR ANY NEW SYMPTOMS.

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 07/01/2016 | Counseling | Diagnosis | Beaudouin, Robert | Verbalizes Understanding |
| 07/01/2016 | Counseling | Safety/Injury Prevention | Beaudouin, Robert | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** No
**Telephone/Verbal Order:** No

Completed by Beaudouin, Robert MD on 07/01/2016 10:47

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: NGONO, ANDRE | | Reg #: 77244-054 |
| Date of Birth: 03/24/1972 | Sex: M    Race: BLACK | Facility: NYM |
| Encounter Date: 07/20/2016 10:00 | Provider: Joaquin, Y. MLP | Unit: Z03 |

Injury Assessment - Non-work related encounter performed at Special Housing Unit.

**SUBJECTIVE:**

    **INJURY  1**    **Provider:**  Joaquin, Y. MLP

        **Date of Injury:**  07/20/2016 09:46      **Date Reported for Treatment:**    07/20/2016 10:10

        **Work Related:**  No      **Work Assignment:**    UNASSG

        **Pain Location:**  Knee-Left

        **Pain Scale:**   5

        **Pain Qualities:**  Dull

        **Where Did Injury Happen (Be specific as to location):**

           Special housing unit Holding cell

        **Cause of injury (Inmate's Statement of how injury occurred):**

           Inmate was combative and angry. Stated "I have an injury".

        **Symptoms (as reported by inmate):**

           Left knee pain.

**OBJECTIVE:**

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 07/20/2016 | 10:31 NYM | 97.2 | 36.2 | Oral | Joaquin, Y. MLP |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 07/20/2016 | 10:31 | 103 | Via Machine | Regular | Joaquin, Y. MLP |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 07/20/2016 | 10:31 NYM | 146/96 | Right Arm | Sitting | Adult-regular | Joaquin, Y. MLP |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 07/20/2016 | 10:31 NYM | 100 | Room Air | Joaquin, Y. MLP |

**Exam:**

    **General**

        **Affect**

           Yes: Cooperative, irritable

**Exam Comments**

    Inmate was on the floor in the holding cell secured by staff. Questioned inmate Ngono about injuries He stated "I have an injury. He was combative, angry and trying to get up from the floor.

    Later on inmate became cooperative and allow medical assessment for injuries.

    He has a bruise/abrasion on left knee. No deformities, no tenderness to the palpation. no lacerations, no hematomas. Inmate has good range of motion on his left knee. Ambulates without any difficulties.

    Area cleaned with sterile saline solution and betadine. Sterile large Band-Aid applied.

**ASSESSMENT:**

    Superficial injury of knee, S80919S - Current

| Inmate Name: | NGONO, ANDRE | | | | Reg #: | 77244-054 |
|---|---|---|---|---|---|---|
| Date of Birth: | 03/24/1972 | Sex: | M    Race:  BLACK | | Facility: | NYM |
| Encounter Date: | 07/20/2016 10:00 | Provider: | Joaquin, Y. MLP | | Unit: | Z03 |

**PLAN:**

**New Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | Ibuprofen Tablet | 07/20/2016 10:00 | 600 mg Orally  -  three times a day x 3 day(s) -- As needed for left knee pain.<br>Take it with food. |

**Indication:** Superficial injury of knee

**Disposition:**

   Follow-up at Sick Call as Needed

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 07/20/2016 | Counseling | Access to Care | Joaquin, Y. | Verbalizes Understanding |
| 07/20/2016 | Counseling | Hand & Respiratory Hygiene | Joaquin, Y. | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** Yes

**Telephone/Verbal Order:**  No

Completed by Joaquin, Y. MLP on 07/20/2016 10:47
Requested to be cosigned by  Beaudouin, Robert MD.
Cosign documentation will be displayed on the following page.

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name: NGONO, ANDRE | | | Reg #: 77244-054 |
| Date of Birth: 03/24/1972 | Sex: M Race: BLACK | | Facility: NYM |
| Encounter Date: 08/18/2016 13:47 | Provider: Evangelista, C. MLP | | Unit: Z03 |

Injury Assessment - Non-work related encounter performed at Health Services.

**SUBJECTIVE:**

    **INJURY 1**    **Provider:** Evangelista, C. MLP

        **Date of Injury:** 08/18/2016 12:45    **Date Reported for Treatment:** 08/18/2016 13:47

        **Work Related:** No    **Work Assignment:** UNASSG

        **Pain Location:**

        **Pain Scale:** 0

        **Pain Qualities:**

        **Where Did Injury Happen (be specific as to location):**

            SHU- K tier

        **Cause of Injury (Inmate's Statement of how injury occurred):**

            Inmate was put in forced cell move for not following orders and refusing to be cuffed. OC was sprayed.

        **Symptoms (as reported by inmate):**

            Inmate combative and screaming in the process. Tearing with no noted breathing problem after OC was sprayed. Abrasion noted on right foot and left leg. AT this time no other injuries to inmate was noted.

**OBJECTIVE:**

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 08/18/2016 13:56 | | 92 | | | Evangelista, C. MLP |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 08/18/2016 | 13:56 NYM | 158/88 | | | | Evangelista, C. MLP |

**Exam Comments**

    Inmate combative, screaming and refused to cooperate. OC was sprayed and decontaminated in the shower. Tearing and nasal mucosa cleaned on face. Abrasion noted on dorsal portion of right foot( 1-2cm ) and left leg (2-3 cm), cleaned with antiseptic. Vitals done, no noted breathing problem. Inmate was seen a few minutes after the move to give his medications, where inmate was washing himself in his cell and flooding the floor still angry. Will follow up for any further complaints.

**ASSESSMENT:**

    Injury, unspecified, T1490 - Current

**PLAN:**

**Disposition:**

    Follow-up at Sick Call as Needed

    Follow-up in 12-24 Hours

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|

| Inmate Name: | NGONO, ANDRE | | | Reg #: | 77244-054 |
| Date of Birth: | 03/24/1972 | Sex: | M   Race:  BLACK | Facility: | NYM |
| Encounter Date: | 08/18/2016 13:47 | Provider: | Evangelista, C. MLP | Unit: | Z03 |

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 08/18/2016 | Counseling | Access to Care | Evangelista, C. | Verbalizes Understanding |

**Copay Required:** No        **Cosign Required:** Yes

**Telephone/Verbal Order:** No

Completed by Evangelista, C. MLP on 08/18/2016 14:06
Requested to be cosigned by  Bussanich, A. MD/CD.
Cosign documentation will be displayed on the following page.



**Bureau of Prisons**
**Health Services**
**Cosign/Review**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | NGONO, ANDRE | | | Reg #: | 77244-054 |
| Date of Birth: | 03/24/1972 | Sex: | M | Race: | BLACK |
| Encounter Date: | 08/18/2016 13:47 | Provider: | Evangelista, C. MLP | Facility: | NYM |

**Cosigned by Bussanich, A. MD/CD on 08/18/2016 16:13.**

## Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | | |
|---|---|---|---|---|
| Inmate Name: NGONO, ANDRE | | | | Reg #: 77244-054 |
| Date of Birth: 03/24/1972 | | Sex: M   Race: BLACK | | Facility: NYM |
| Encounter Date: 08/18/2016 13:47 | | Provider: Evangelista, C. MLP | | Unit: Z03 |

Injury Assessment - Non-work related encounter performed at Health Services.

**SUBJECTIVE:**

    **INJURY  1      Provider:**  Evangelista, C. MLP

       **Date of Injury:**        08/18/2016 12:45        **Date Reported for Treatment:**      08/18/2016 13:47
       **Work Related:**        No            **Work Assignment:**      UNASSG
       **Pain Location:**
       **Pain Scale:**    0
       **Pain Qualities:**
       **Where Did Injury Happen (be specific as to location):**
         SHU- K tier
       **Cause of Injury (Inmate's Statement of how injury occurred):**
         Inmate was put in forced cell move for not following orders and refusing to be cuffed. OC was  sprayed.
       **Symptoms (as reported by inmate):**
         Inmate combative and screaming in the process. Tearing with no noted  breathing problem after  OC was
         sprayed. Abrasion noted on right foot and left leg. AT this time no  other injuries to Inmate was noted.

**OBJECTIVE:**

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 08/18/2016 | 13:56 | 92 | | | Evangelista, C. MLP |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 08/18/2016 | 13:56 NYM | 158/88 | | | | Evangelista, C. MLP |

**Exam Comments**

    Inmate combative, screaming and refused to cooperate. OC was sprayed  and decontaminated in the shower. Tearing
and nasal mucosa cleaned on face. Abrasion noted on dorsal portion of right foot( 1-2cm) and left leg (2-3 cm),
cleaned with antiseptic. Vitals done, no noted  breathing  problem. Inmate was seen a few minutes after the move  to
give his  medications, where  Inmate was washing himself in his cell and flooding the floor still angry. Will follow up  for
any further complaints.

**ASSESSMENT:**

    Injury, unspecified, T1490 - Current

**PLAN:**

**Disposition:**
    Follow-up at Sick Call as Needed
    Follow-up in 12-24 Hours

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|

| Inmate Name: | NGONO, ANDRE | | | Reg #: | 77244-054 |
| Date of Birth: | 03/24/1972 | Sex: | M    Race:   BLACK | Facility: | NYM |
| Encounter Date: | 08/18/2016 13:47 | Provider: | Evangelista, C. MLP | Unit: | Z03 |

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 08/18/2016 | Counseling | Access to Care | Evangelista, C. | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** Yes

**Telephone/Verbal Order:** No

Completed by Evangelista, C. MLP on 08/18/2016 14:06
Requested to be cosigned by  Bussanich, A. MD/CD.
Cosign documentation will be displayed on the following page.



# Bureau of Prisons
# Health Services
# Cosign/Review

| Inmate Name: | NGONO, ANDRE | | | Reg #: | 77244-054 |
|---|---|---|---|---|---|
| Date of Birth: | 03/24/1972 | Sex: | M | Race: | BLACK |
| Encounter Date: | 08/18/2016 15:32 | Provider: | Evangelista, C. MLP | Facility: | NYM |

**Cosigned by Bussanich, A. MD/CD on 08/18/2016 16:14.**

**Bureau of Prisons**                    **\*\*SENSITIVE BUT UNCLASSIFIED\*\***
**Psychology Services**
**SHU Review**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Inmate Name:** | NGONO, ANDRE | | | | **Reg #:** | 77244-054 |
| **Date of Birth:** | 03/24/1972 | **Sex:** | M | **Facility** NYM | **Unit Team:** | 7 |
| **Date:** | 08/18/2016 07:58 | **Provider:** | Schlessinger, K. PsyD/PhD | | | |

| | | | |
|---|---|---|---|
| **Placed in SHU:** | 07/01/2016 | **Type:** | SHU |
| **Status:** | ADMIN.DETENTION | **Threat to Self:** | Low |
| **Basis of Review:** | Inmate was interviewed | **Adjustment:** | Satisfactory, segregation not detrimental |
| **Mental Status:** | No significant mental health issues. | | |
| | | **Threat to Others:** | Low |

**Comments**

Monthly SHU Review Note

Note: This SHU review is a brief evaluation of this inmate's current mental status in SHU. Although an inmate may exhibit adequate adjustment to his SHU confinement and a lack of acute distress at this current time, it does not preclude the fact s/he may suffer from a psychological disorder requiring additional psychological services. This SHU review is also not a risk assessment of an inmate's potential for violent behaviors. Rather, it is an assessment of whether the inmate exhibits any aggressive or violent behaviors at the time of the SHU review.

Subjective/Objective data: Inmate displayed no evidence of depression or suicidality and appeared to be adequately adjusting to SHU placement. This adjustment was determined by clinical presentation, his self report and Unit personnel statements.

Assessment/Plan: Inmate is currently psychologically stable. He has been instructed to contact Psychology Department staff for support should he request, or be in need of mental health services. Unit staff are aware of the referral process. Inmate will be seen on an as needed basis or monthly for SHU reviews.

Completed by Schlessinger, K. PsyD/PhD on 08/18/2016 09:27

NYM 1330.7
ATTACHMENT 1

**METROPOLITAN CORRECTIONAL CENTER, NEW YORK**
**ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES**

**INFORMAL RESOLUTION FORM (BP-8)**

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP-229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _Susl 1-31-17_

INMATE'S COMMENTS:

1. Complaint: _On 06/18/2016 around noon time Lieutenant NGonzalez entered my maximum secured cell in the segregation housing unit (SHU) located on 9 South in MCC. NGonzalez inflicted me severe injuries on various body part including but not limited to my head, torso, legs, back and arms. Gonzalez also failed to stop his officer who sexually molested me in front of him and under the cameras (cell, medical office)._

2. Efforts made by you to informally resolve: _____

_____

3. Names of staff you contacted/Date you contacted the staff: _____

_____

Date returned to Correctional Counselor: _____

_NGono Andre. M._      _77244-054_      _1-31-17_
Inmate's Name              Register Number        Date

CORRECTIONAL COUNSELOR'S COMMENTS:

1. Efforts made to informally resolve and staff contacted: _____

_____

_____

Date informally resolved: _____  Counselor Signature: _____

Date BP-229(13) Issued: _____

Unit Manager: _____

**RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY - PART B**

Inmate Name: **Ngono, Andre**
Reg. No. **77244-054**
Administrative Remedy Id.:**891663-F1**

This is in response to your Request for Administrative Remedy dated January 31, 2017, wherein you allege that on August 18, 2016, staff entered your cell in the Special Housing Unit (SHU) and inflicted serious injuries to various body parts. You also allege that the Lieutenant failed to stop another staff member from sexually molesting you. Furthermore, you are requesting monetary compensation

Please be advised that your claims of excessive force are untimely and will not be addressed in this response. However, your claims of sexual assault are not time barred and are addressed below.

A review of your allegation revealed that on August 18, 2016, at approximately 12:48 p.m., you were the subject of a Calculated Use of Force, which was captured on video. Upon completion of the Use of Force, an After Action Committee reviewed the incident to and found it to have been justified. In addition, the After Action Committee review did not identify any discrepancy indicating you were sexually molested as you claim.

Based on the above information, your request for relief is denied.

If you are dissatisfied with this response, you may appeal to the Regional Director, Northeast Region, Federal Bureau of Prisons, Northeast Regional Office, U.S. Customs House - 7th Floor, 2nd & Chestnut Streets, Philadelphia, PA 19106, within 20 calendar days of the date of this response.

3/3/2017
Date

E.L. Tatum, Jr., Warden

NGONO, Andre
Reg. No. 77244-054
Appeal No. 891663-R2
Page One

---

### Part B - Response

You appeal the response from the Warden at MCC New York regarding
your claim you were assaulted by staff. You also allege staff would
not provide you a pen or paper so you can report this incident. You
request to this matter to be investigated.

A review of your appeal revealed the Warden adequately addressed your
complaint, and correctly advised your allegations have been reviewed
by the After Action Committee.  All documentation and video evidence
was also reviewed by the Northeast Regional Correctional Services
Office.  You failed to provide any additional information or
evidence to this office to review this matter any further.
Accordingly, your appeal is denied.

If you are dissatisfied with this response, you may appeal to the
General Counsel, Federal Bureau of Prisons.  Your appeal must be
received in the Administrative Remedy Section, Office of General
Counsel, Federal Bureau of Prisons, 320 First Street, N.W.,
Washington, D.C. 20534, within 30 calendar days of the date of this
response.

Date: April 27, 2017

M. D. CARVAJAL
Regional Director

**Administrative Remedy No. 891663-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal where you allege on August 18, 2016, staff members at MCC New
York entered your cell and physically assaulted you, inflicting
serious injuries to various body parts.  You also claim the
Lieutenant failed to stop an officer from sexually molesting you
during this incident.  You request compensation for injuries.

The Warden and Regional Director adequately addressed your
allegations against staff.  As indicated, a review by the After
Action Committee found staff acted appropriately regarding this
matter.  In addition, no credible evidence was presented to support
your claim of being sexually molested by staff nor do you provide
any specific details regarding this alleged incident.  We concur
with the responses provided and find no further review is warranted.

As to your request for compensation, the Administrative Remedy
Program does not ordinarily provide for monetary relief.  Your
request for monetary compensation should be pursued through the
appropriate statutorily-mandated procedure to resolve this issue.

Accordingly, your appeal is denied.

_6|14|17_
Date

_____
Ian Connors, Administrator
National Inmate Appeals /AME




07/17/2019
US POSTAGE $006.20º

ZIP 31537
011E11674811



ELOPE TO THE RIGHT
LD AT DOTTED LINE
MAIL®

6188 0461

CLERK'S OFFICE (PRO SE INTAKE)

DANIEL PATRICK MOYNIHAN UNITED STATES COURTHOUSE

500 PEARL STREET, ROOM 120

NEW YORK, NY 10007

USM P3
SDNY